### UNITED STATES v. AMERICAN BREWING CO.

(District Court, E. D. Pennsylvania. February 15, 1924.)

#### No. 254.

1. **Internal revenue ⬅45—So-called tax on liquors unlawfully manufactured is penalty.**
   The tax on fermented liquors containing one-half of 1 per cent. or more of alcohol, imposed by Revenue Act 1919, § 608 (Comp. St. Ann. Supp. 1919, § 6144bb), continued in force by Revenue Act 1921, since the enactment of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) is a penalty and not a tax.

2. **Intoxicating liquors ⬅248—Search warrant not issuable to prohibition agent under internal revenue laws.**
   Rev. St. § 3462 (Comp. St. § 6364), providing for issuance of search warrants to internal revenue officers in aid of the internal revenue laws, does not authorize the issuance of a warrant on the affidavit of a prohibition agent.

3. **Intoxicating liquors ⬅246—Instrumentalities used in violation of Prohibition Act are subject to seizure and forfeiture.**
   Physical instrumentalities employed in violation of National Prohibition Act (Comp. St. Ann. Supp. 1919, § 10138¼ et seq.) are subject to seizure and forfeiture.

4. **Intoxicating liquors ⬅249—Search warrant may be issued to prohibition agent; "civil officer."**
   Under Prohibition Act, tit. 2, § 2 (Comp. St. Ann. Supp. 1923, § 10138½a), a search warrant may be issued to a prohibition agent, who, for

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the purposes of its execution, is a "civil officer" within the meaning of Espionage Act, tit. 11, § 6 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10496¼f).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Civil Officer.]

5. **Intoxicating liquors** ☞249—**Search warrant does not authorize officer to levy upon and impound property.**

A search warrant must describe the premises to be searched and the property to be searched for and seized, which must be brought before the officer issuing the warrant, and confers no authority on the person to whom it is issued to seize and inventory property and leave it impounded on the premises of the owner in charge of a custodian.

6. **Intoxicating liquors** ☞249—**Legality of warrants for search of premises of permittee considered.**

Motions to quash warrants issued for search of premises in which business was being carried on under a permit denied.

McKeehan, District Judge, dissenting.

Libels of Forfeiture. Suit by the United States against the American Brewing Company, with other suits argued as one and disposed of herein. On motions by defendants (1) to quash search warrants, set aside service thereof, and for return of seized property; (2) to dismiss libels; and (3) for leave to file bonds. Motions to set aside service of search warrants and for leave to file bonds granted; other motions denied.

Francis B. Biddle, Sp. Asst. U. S. Dist. Atty., of Philadelphia, Pa., Burt W. Andrews, Sp. Asst. U. S. Dist. Atty., of Washington, D. C., and George W. Coles, U. S. Atty., of Philadelphia, Pa.

Ladner & Ladner, of Philadelphia, Pa., for American Brewing Co. William A. Glasgow, Jr., Theodore F. Jenkins, Francis Shunk Brown, William A. Gray, Francis J. McCarthy, George Russell, and Francis J. Maneely, all of Philadelphia, Pa., and Arthur L. Shay, of Lancaster, Pa., for other defendants.

Before DICKINSON and McKEEHAN, District Judges.

PER CURIAM. There are a number of these cases. They have been argued as one and will be disposed of in one opinion, as they raise general questions common to all.

These cases primarily concern themselves with the Volstead Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq.) and secondarily with the revenue statutes. The latter are called in merely to buttress the law prohibiting traffic in intoxicating liquors. The broad basis of the law is that any traffic which is being so conducted as to threaten the common weal may be regulated, or, if need be, suppressed. The libel proceedings were instituted and writs of attachment issued upon the theory that all physical instrumentalities concerned in an infraction of the law become subject to seizure, confiscation, and forfeiture. This raises the first and broadest question. There were also search warrants issued. This brings into question the regularity of their issuance and execution. One question raised is a general one, both because it is common to all the cases and because also it affects a general practice which has been followed in all search warrant proceedings.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The first question is the broad one of the right to seize property to be followed by a finding of confiscation and forfeiture. There are two considerations which add to the importance of the question. One is that it is doubly exasperating to any lover of law and order that persons who are given the privilege, in the form of a permit to do business, on the faith that they would observe the law, flaunt their violation of it almost in the face of those who are charged with the duty of enforcing it. The other is the claim of power given to any enforcement officer to seize thousands of dollars worth of property whenever he thinks the law has been violated, and to deprive the owners of its use until the question of violation can be determined.

This right of forfeiture under the provisions of the Volstead Act must be boldly avowed and the question of its legality squarely met and defended. There is little, if anything, gained by seeking to bolster it up with the revenue statutes, otherwise than by way of analogy and to supply modes of procedure. Resort to the expedient of having the enforcement officer, who serves the warrant, given an eleventh hour admission into the ranks of revenue agents or adding to the affidavit, which would support the warrant under the Espionage Act (40 Stat. 225), another affidavit in the verbiage of the revenue statutes, smacks too much of the proverbial grasping at straws, and is too suggestive of the frantic scrambles of one who is lost in darkness and knows no way into the light.

[1] We are clearly of opinion that for several reasons the provisions of the internal revenue laws do not apply to any of these cases, and that these libels and search warrants must stand or fall under the authority of the National Prohibition Act. The authorization of warrants of search and seizure under the internal revenue laws and sections 3340 and 3450 of the Revised Statutes (Comp. St. §§ 6146, 6352), dealing with the forfeiture of property, are solely in aid of the collection of taxes. But the so-called tax imposed by section 608 of the Act of February 24, 1919 (Comp. St. Ann. Supp. 1919, § 6144bb), re-enacted in 1921, is clearly a penalty and not a tax. The decisions of the Supreme Court are conclusive as to this. Helwig v. U. S., 188 U. S. 605, 23 Sup. Ct. 427, 47 L. Ed. 614; Lipke v. Lederer, 259 U. S. 557, 42 Sup. Ct. 549, 66 L. Ed. 1061; Regal Drug Corporation v. Wardell, 260 U. S. 386, 43 Sup. Ct. 152, 67 L. Ed. 318.

[2] Again, none of these warrants or supporting affidavits aver any facts showing, or tending to show, any violation of the internal revenue laws. None of them state that a tax is due, still less that any tax due is unpaid. Furthermore, none of these warrants were issued on affidavits of internal revenue agents. The affidavits are by prohibition agents, and all of them pray for the issuance of search warrants "under the authority of title 2 of the National Prohibition Act." The warrants themselves recite that they are issued under that authority, and all of them are directed to prohibition agents and not to internal revenue agents. Section 3462 of the Revised Statutes (Comp. St. § 6364) provides for the issuance of "a search warrant, authorizing any internal revenue officer to search any premises * * * if such officer makes oath in writing that he has reason to believe, and does believe, that a fraud upon the revenue has been or is being committed

upon or by the use of the said premises." This does not authorize the issuance of a warrant of search and seizure in aid of the internal revenue laws upon the affidavit of a prohibition agent. U. S. v. Spencer (D. C.) 292 Fed. 871.

[3] We must therefore face the question of whether the Volstead Act authorizes a decree of forfeiture.

The argument in support of the libels proceeds upon the theory that forfeitures follow a policy of the law which condemns to confiscation any and every res, the use of which had aided in any act which the law condemns. The wisdom of this policy of the law may be commended or denied. It is, however, of ancient origin. By the' Mosaic law, "if an ox gore a man or a wòman so that they die, the ox shall be stoned and its flesh shall not be eaten." In cases of felo de se, the instrument of self-destruction, or even all the goods and chattels of the suicide, were, under the laws of England, forfeited to the king. More modern illustrations are afforded by the seizure, confiscation, and forfeiture, followed, if need be, by the destruction. of counterfeit money, and all the physical instrumentalities by which the counterfeiting was done, or by the like seizure of whatever may be said to have had ·a part, or to have figured in an attempted perpetration of a fraud against the revenue. Guilt is imputed to the res, and what follows is that all right of property in and of possession to the guilty thing is gone. Incidentally this denial of the right to possession takes out of the case the distinction made between questions of title to property and of the right of possession, with the forceful and impressive argument based upon it. Indeed, the distinction in itself does not exist, except that the right of property in the sense of the full ownership of anything may be divided among and shared by many, one of whom may have the sole right to immediate possession.

The conclusion is that property concerned with a violation of the Volstead Act may be forfeited by libel proceedings, and that the motions to dismiss the libels on this ground are denied.

[4] An essential part of any legal proceeding is the process to which resort is had. Here a part of the process was a search warrant. Motions have been interposed to quash these warrants as unauthorized and as not issued, directed, and executed in conformity with law.

The questions raised on these motions are likewise of importance because they concern all whose persons, homes, papers, and other property may become the subject of arrest, search, and seizure. These cases happen to arise out of the Volstead Act, but the law discussed applies alike to all kinds of offenses with which persons may be charged. Indeed, the power of search, as expressed in the Volstead Act, is, in at least one respect, a more restricted power than that which may be exercised in the case of offenses under other laws. The statute which regulates search warrants was passed before the Volstead Act, which incorporates it by reference.

Before going into other grounds of criticism of these warrants, we will dispose of one point which has been made the subject of special emphasis. The Volstead Law refers us to the Espionage Act for the conditions of the issuance, form, and service of search warrants. This

act, among other things, prescribes to whom such warrants shall be directed. The words of description employed are (inter alia) "civil officer." The question at once arises whether the enforcement officer, to whom these warrants were directed, was a "civil officer" within the meaning of the law.

The very resourceful counsel who dealt with this feature in the argument addressed to us goes to clause 1, § 2, of article 2 of our Constitution for a definition of who are "officers," and asks us to find that they are those who owe their appointment to the offices they hold, to the President (acting by and 'with the advice and consent of the Senate); the President alone; the courts or the heads of departments.' If the premises on which the argument addressed to us proceeds are conceded, the mind is swept along to an acceptance of the conclusion reached.

This takes us to an inquiry into the premises. One is that in the designation of the persons who may execute a search warrant, the words "civil officer" in the Espionage Act are used in the sense of the word "officer" used in the Constitution, and there mean an officer of such dignity and importance as to have been the personal selection of the President or a least a department head. The question raised is far more than a so-called technical question. The power exercised in the issuance and execution of a search warrant is one of grave importance, and the. attending responsibility is correspondingly grave. The people acting through their representatives in Congress might be well content to intrust this high power to an official whose office had the dignity which attaches to an official chosen by the President or the head of a department, and yet would refuse to confer it upon a mere process server of whose responsibility no such assurance was given. The weight and force of this is felt. Congress, however, might just as well guard with sedulous care the issuance of search warrants and the occasion for their issuance, and after this leave the mere duty of the physical seizure to any duly authorized process server without being subject to any fair criticism of failing to appreciate the importance of the power which was called into being.

The whole question thus becomes one of what Congress did do. The mere words employed have no more significance than mere verbiage usually. has. The word "officer" is a term applied indiscriminately to constables and patrolmen, as well as to those who fill offices of the highest dignity and importance. The word "civil" is commonly used to distinguish those who are in the public service but not of the "military." It is a least doubtful whether the word "officer," even as employed in the Constitution, has always the meaning ascribed to it in the argument, and the perhaps equivalent phrase of the holder of an "office" or one "holding office" has not. Surely no one would so construe article 6 that the prohibition of a religious test applied only to officers named by the President, or the head of a department, nor would section 6 of article 1 (where the words are "civil office"), nor other clauses dealing with persons "holding any office of trust or profit," be given a like limited meaning. However this may be, we think a reading of the Espionage Act, read in the light of the context and the whole

spirit and purpose of the act, makes it clear that the words "civil officer" were chosen to express the will of Congress, that those charged with offenses under that act should in no way be subjected to the military power. The other words used make it clear that an enforcement officer may execute such warrants. The phrase is "a civil officer of the United States duly authorized to enforce or assist in enforcing any law thereof, or to a person so duly authorized by the President of the United States." Espionage Act, tit. 11, § 6 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10496¼f).

Since the argument we have had the benefit of the expression of the opinion of Judge Woodrough in United States v. Musgrave (D. C.) 293 Fed. 203. The considerations which have led him to take the contrary view to that we have taken are clearly and forcibly expressed, but have left us unconvinced. The warrants here were directed in accordance with the general practice, and such warrants have been upheld by the rulings of this and many other courts, although it is true that the question now before us was not raised or at least discussed.

Our conclusion is that these warrants were properly directed to "a civil officer," etc.

[5] There is, however, running all through these proceedings and exhibited in the application for and the execution of and return made to these search warrants, a total misconception of what a search warrant is and its function. The most casual glance discloses that the thought was that a search warrant is a writ, in the nature of an attachment or execution, which directed a levy to be made upon all the property found upon the designated premises, with a clause of dispossession and sequestration added. This is made evident, not only by what is usually done in execution of the writ, but also by the return made. There is a levy upon everything found, a full inventory made, the things seized are left impounded upon the premises, of which possession is kept and held, at least to the extent of placing a guard or watchman in charge, and always by a warning to the owner that none of the impounded property is to be touched.

All of this is founded upon a mistake. The service and execution of all of these search and seizure warrants must be set aside. As we have observed, the method of execution was based on a total misconception of what a search warrant is and was not a compliance with either the language of the statute or the mandates of the warrants, both of which require that the seized property shall be brought before the officer issuing the warrant. The continued presence of the executing officers on the premises of the defendants is without warrant of law. They had no right to remain on the defendants' premises longer than was reasonably necessary to make a search and remove such personal property as they were authorized to seize.

We have already held, in Mellet & Nichter Brewing Company, that there is no authority conferred by a search warrant to seize real estate. This means that it cannot thus be "padlocked" or the possession of the owner in any way disturbed, interfered with, or curtailed excepting so far as may be reasonably necessary to the lawful execution of the search warrant. Furthermore, in all of the cases, the inventories filed

with the Commissioner include a great deal of property that is not within the descriptions contained in the warrants, and in one or two of the cases entire premises not referred to in the warrants have been seized and occupied. For instance, in the case of Rettig Brewing Company, the warrant describes by metes and bounds premises located at 819 West Market street, Pottsville. The inventory filed with the Commissioner, in addition to containing what seems to be a complete list of all the property, real and personal, located on these premises, enumerates five trucks which are noted as located in a garage at 721 West Arch street, Pottsville, and also the contents of a bottling establishment at the northeast corner of Ninth and Norwegian streets, which the seizing officer notes in the inventory as not having been in use for the last 20 months. All of the so-called "inventories" enumerate fixtures as well as personal property, and, as to many items, the inventories are not sufficiently specific or descriptive to enable us to ascertain whether they are within the descriptions contained in the warrants. It is the clear duty of the court to set aside such a service and to direct the officers who made seizure under the search warrants, so far as they now have custody and possession of any of the properties in question, to forthwith withdraw.

This leaves only the questions affecting the writs of attachments which issued upon the filing of the libels. The libels were filed subsequent to the seizure under the warrants, and writs of attachments were issued in aid of the libels, under which writs the United States marshal attached the property enumerated in the libels. We note in this connection: First, that in most of the cases the libels enumerate a large part but not all of the property enumerated in the inventories filed under the search warrants; and, second, that practically the execution of the writs of attachment was simply a substitution of possession and custody by the marshal for the possession and custody of the seizing officers.

The requests made at bar for leave to file bonds and for an order upon the marshal to withdraw from possession upon the filing of such bonds are based upon the absence of any fact averment of a continuous violation of the law and the fact that the forfeiture of the property seized proceeds upon the averment of a single violation. In view of this, we grant leave to respondents to file bonds in such sums and with such conditions as may be approved by the court, and upon the filing of a bond in each case the marshal is directed to withdraw from possession and to return the property in his hands and under his control to the respective respondents so entering bond.

The motions to quash the warrants are dismissed; the service and execution of the warrants are set aside; the motions to dismiss the libels are denied; and counsel will submit drafts of decrees in accordance with the foregoing opinion.

[6] The members of the court before whom the cause was heard are in accord upon the foregoing orders being made the orders of the court. In view, however, of differences in opinion which may be held respecting the refusal to quash the warrants, a further reference to this may be made in order that the bearing of the memorandum opin-

ion, filed herewith, may be understood. Proceedings to enforce a forfeiture and to employ the ancillary process of search warrant seizures are urged by counsel to be unnecessarily harsh and indefensively drastic. In the cases of breweries holding permits, it might well be thought that a more direct method of dealing with them could be found in the withdrawal of the permits and thus to avoid the anomaly of one governmental bureau granting permission to conduct a business which was being lawfully conducted and another bureau shutting the place up because it was being conducted unlawfully. The wisdom might also be commended of avoiding all occasion for criticism of a proceeding which might seem to some to be high handed or arbitrary. The withdrawal of a permit from a brewery in which there had been violations of the law (followed, if need be, by a prosecution) would strike no one as unduly harsh treatment, nor would the sense of right, justice, or fairness of any one be shocked thereby. The incongruity is in continuing permission to carry on a business, thus implying compliance with the law, and the same hand which grants the permit seizing and confiscating all the property of the licensee on the ground that the law is being violated. No fault can be found with counsel for respondents urging these considerations upon the attention of the court. It is also to be expected that those charged with the enforcement of this law should feel it, as we have already stated, to be intolerable that these breweries, to which permits have been granted upon assurances given that the law would be observed and kept, defiantly violate it in the very face of the enforcement officers. The law is admittedly drastic, but only because, as has been before observed, it is necessarily so. Those with whom this law deals are notorious for their evasion of it, and no loophole of escape from the consequences of violations must be left unclosed. The question of whether revocation of permit should precede a judicial finding of a violation of the law or follow it thus becomes wholly one of administrative policy. All real or seeming inconsistency of action could readily be avoided by a revocation of the permit, but none of these considerations can be permitted to weigh with a court. We can simply, on the facts as they are pleaded, pronounce the law. The fact that trucks loaded with illicit beer, in vessels in which it is commonly sold, are seen to leave a brewery, and the beer is delivered at saloons or places in which sales are made, reasonably justifies an inference of a violation of law and supports the issuance of a warrant. Room for difference of opinion may exist, however, in respect to whether the affidavit, upon which a warrant issues in a particular case, discloses "reasonable cause" or does not.

### Supplemental Opinion.

McKEEHAN, District Judge. I am in full accord with the foregoing per curiam opinion, except that in the cases in which the petitioners were operating under government permits, I would quash the warrants. I do not mean that the possession of a permit renders the permittee immune from search and seizure. Nevertheless, in view of the manifest intent of the Volstead Act, evidenced by many of its provisions, to vest in the Commissioner of Internal Revenue a comprehen-

sive authority and control over the issuance and revocation of the various permits provided for by the act and a thoroughgoing regulation and supervision of the permittees (a task that is essentially administrative), in view of the methods of manufacture contemplated by the permits here involved, and in view of the evident purpose of the procedure provided for by section 9 of the act for a hearing and finding by the Commissioner, I am of opinion that none of these warrants and affidavits set forth facts sufficient to justify a search and seizure.